## AFFIDAVIT

I, Scott Dahlstrom, Special Agent with the Federal Bureau of Investigation (FBI), being duly sworn, do depose and state under penalty of perjury that the following is true to the best of my information, knowledge and belief:

## INTRODUCTION AND AGENT BACKROUND

1. I am a Special Agent with the FBI, and have been since 2009. I am currently assigned to the Denver Division of the FBI, and specifically to the National Security, Domestic Terrorism squad. I investigate domestic terrorism matters in the normal course of my duties, and I am fully familiar with the facts of the case.  I have led and assisted in investigations of federal criminal violations related to violent crimes, drug investigations, financial crimes, and international and domestic terrorism.  As part of my training and experience, I have participated in investigations involving electronic evidence, emails, text messages, and the Internet.

2. This affidavit is made pursuant to Title 18, United States Code, Section 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), in support of an application for a warrant to search the e-mail account described in Attachment A (hereinafter "SUBJECT ACCOUNT") and all content found therein, there being probable cause to believe that located in the place described in Attachment A are items described in Attachment B, being evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 842(a)(1) (Manufacturing or dealing in explosive material without a license) and 26 U.S.C. §§ 5841, 5861(d), and 5871 (Possessing Unregistered Firearms).

3. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause that evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 842(a)(1) (Manufacturing or dealing in explosive material without a license) and 26 U.S.C. §§ 5841, 5861(d), and 5871 (Possessing Unregistered Firearms) are present at the location described.

4. The information contained within the affidavit is based on my training and experience, as well as information imparted to me by other law enforcement officers involved in this investigation.

## PROBABLE CAUSE

5. The FBI began investigating Kyle Schneider on September 12, 2019, after a Confidential Human Source ("CHS") reported that Schneider is building and selling grenades. Schneider resides at the Subject Premises.

6. The CHS was an informal CHS for a local police department when s/he initially reported information about Schneider.  The CHS has previously reported to local law enforcement on matters which are not in the public domain and have been corroborated.  After the information on Schneider was received, the FBI began working officially with the CHS and opened him/her as an FBI CHS.  The CHS has a felony criminal history and has been convicted of Assaults and Drug Offenses.  The CHS is a known drug user.  The CHS has not received any benefit from the FBI for his/her reporting.  The CHS has requested benefits of child custody but no promises have been made.

7. According to the CHS, on or about August 21, 2019, the CHS met with Schneider for the first time while with an individual hereinafter known as Witness1 and a relative of Witness1.[1] All three were in the CHS's vehicle and stopped by Schneider's residence (the Subject Premises). Schneider came out of the residence to

---

[1] Witness1 was being developed by the FBI to be a Confidential Human Source prior to the investigation but was ultimately not opened as a CHS because FBI was unable to obtain approval from Witness1's parole officer. Witness1 was not complying with terms of parole. Witness1 is a registered sex offender.

1

the car and talked to the relative and gave him what looked like a clump of gray molding clay. They left the residence and the relative stated it was C-4. The clump had a sulfur smell and left gray residue on the CHS's hands. The CHS friended Schneider on Facebook shortly thereafter.

8. The CHS identified Schneider's Facebook account (user ID number 100037296556102, username Ky Sch). I have reviewed Schneider's public Facebook profile, which includes one photograph of an individual who appears to be Schneider with the barrel of what appears to be a shotgun lying next to him. The photograph also shows a partial view of the grip of another unknown firearm. This photograph was uploaded on August 1, 2019.

9. After meeting Schneider, the CHS communicated with Schneider through Facebook and personal visits to the Subject Premises. According to the CHS, on or about August 24, 2019, Schneider asked the CHS in person to purchase materials in order for Schneider to make explosives. Schneider gave a list of items on a piece of paper but Witness1 lost the paper. On or about August 28, 2019, the CHS repeated numerous ingredients to Schneider, through Facebook, that he had asked the CHS to purchase. I have reviewed Facebook messages between the CHS and Schneider, as provided by the CHS. On or about August 28, 2019, the following exchange happened between the CHS and Schneider:

> CHS: "Hey can you send me the list of shit I need to buy. [Witness1] must have three it away."
> CHS: "Threw"
> CHS: "I want to get everything right"
> . . .
>
> CHS: "My friend is at the store picking this shit up for me and is getting mad at me"
> CHS: "I remember vasaline, potassium nitrate, wax, distilled water, hydrometer, and bleach."
> CHS: "Am I missing anything"
> Schneider: "My bad we're getting about three done today I had to go help bring some shit in we need whit camping fuel potassium chloride bleach".
> CHS: "Because we have the Dest?"
> CHS: "Rest? Fucking type correct. I will see if I can drop it off"
> Schneider: "I mentioned getting the bathroom redone"
> Schneider: "I mean ment not mentioned stupid phone"
> CHS: "Its that military friend I told you about. He was giving out secrets and took something he should not have so he got booted lol"

10. On or about August 29, 2019, the CHS reported that Schneider asked the CHS to "go smoke" with him through a text message. The CHS explained that s/he understood Schneider to be referring to methamphetamine, as the CHS has known Schneider to use that particular drug.

11. The CHS reported that s/he has been to the Subject Premises on numerous occasions. On or about September 11, 2019, the CHS reported visiting Schneider's residence with Witness1. The CHS reported that during that visit, Witness1 took pictures of what appeared to be a grenade using the CHS's telephone. According to the CHS, Schneider offered to sell the grenade to the CHS for $800. Witness1 also took photographs of ingredients and instructions listed on a piece of paper that included a reference to the "Anarchist Cookbook." The CHS provided these photographs to the FBI. The CHS also reported that Schneider claimed to be selling 16 of the grenades to the Hells Angel's Motorcycle Club and explained that he buys empty grenade casings from local army supply stores and fills them with the explosives. Witness1 stated to the FBI, in the presence of the CHS, that Schneider kept the destructive devices at a location other than the Subject Premises.

12. FBI bomb technicians have reviewed the photographs provided by the CHS showing ingredients and instructions on how to mix those ingredients. Based on that review, the list appears to depict real instructions on how to make a destructive device.

13. I have reviewed the photographs provided by the CHS. The photograph of the device the CHS says Schneider offered to sell appears to show a destructive device with a grenade shell similar to an M67 grenade. The shell is gray in color and had been scored on the outside. Scoring the outside of a destructive device may create more shrapnel upon detonation.

14. Surveillance was initiated by the FBI on the Subject Premises on September 16, 2019. Based on that surveillance, Schneider appears to spend the majority of his time at the Subject Premises and moves frequently between a shed on the property and the main residence. Surveillance never observed Schneider to drive a vehicle, but he did occasionally walk to meet people in person or to get rides from unknown individuals.

15. On September 23, 2019, the CHS went to the Subject Premises at the direction of the FBI. The CHS went to a shed on the property and saw Schneider in possession of another grenade similar to the one shown in the photograph provided by the CHS. The CHS was unsure if it was the same device. According to the CHS, Schneider stated he has made additional grenades and has distributed them. Schneider brought the grenade to the shed from the main residence. The CHS also reported seeing a bucket in the shed that contained what s/he described as "crystals" and smelled of a strong odor of bleach and fuel. The CHS stated this was produced by following the directions written on the paper previously photographed and given to the FBI. Bleach and gasoline are listed as ingredients for making explosives on the instructions previously provided to the FBI. The CHS says that s/he has observed the bucket of "crystals" on prior visits to the Subject Premises. Each time, the bucket of crystals has depleted in amount. According to the instructions provided by the CHS, the crystals are potassium chloride and can be ground into a powder for further mixing for explosive making.

16. On or about September 24, 2019, the CHS sent a picture to the FBI of a five dollar bill and stated s/he watched Schneider make that bill on a printer and it appeared Schneider was attempting to produce counterfeit United States currency.

17. On September 30, 2019 during surveillance, Schneider was observed leaving the Subject Premises on foot while using his cellular telephone. Schneider was also observed taking a plastic bag out of his pocket. Schneider then met an unknown male close to the Subject Premises for approximately 15 minutes. Schneider then ran hurriedly back to the Subject Premises.

18. On or about October 2, 2019, Witness1 was arrested for parole violations. The CHS was present and was also arrested for attempted influence of a public official by telling them his/her status as an FBI CHS.

19. After the arrest, Witness1 stated s/he lied about Schneider keeping the destructive devices at a location other than the Subject Premises. Witness1 stated s/he lied in order to delay and hopefully gain a benefit from the FBI. Witness1 told family members about the CHS's involvement with Schneider and reporting to the FBI. Witness1 told the family members that if s/he were ever arrested, it would be the CHS's fault and to let people know that the CHS was working with the FBI. When Witness 1 and the CHS were arrested, the family members let other unknown individuals know about the CHS and flyers were posted around Commerce City letting people know that the CHS was working with the FBI. Schneider became aware of this information and asked the CHS to never contact him again. According to the CHS, Witness1 was jealous of the relationship the CHS and Schneider had.

20. On October 11, 2019, the FBI collected trash from the curb of the Subject Premises. The trash contained a gallon size Ziploc bag that had trace amounts of a white substance. This substance field tested positive for

methamphetamine.   Also found in the trash was a shotgun shell that was not fired but split open with the contents removed and a color photocopy of the front and back of a 50 dollar bill.

21. On October 18, 2019, the FBI collected trash from the curb of the Subject Premises. The trash contained one empty 2.5 gallon container of kerosene fuel. Kerosene is a common fuel used to produce heat. According to the ingredients and instructions for explosives produced by the CHS, a reliable heat source is needed to heat and produce the explosive mixture. Also found were two shotgun shells that were not fired but split open with the contents removed and three smaller pieces of shotgun shells that appeared to be cut as well. Finally, over 100 partial brown glass pipes, approximately three to five inches in length, were found. These pipes were covered in white residue.  These types of pipes are commonly used to smoke drugs, particularly methamphetamine. The pipes appeared to all be broken in the same location where a bulb would be located. The bulb is where the drugs would be placed and then heated in order to be consumed by the user.

22. According to the Bureau of Alcohol, Tobacco, and Firearms (ATF), a license check was performed on Schneider and it was shown that Schneider does not possess a license to manufacture, deal, possess, or import explosives. Schneider is also not registered in the National Firearms Act database as having registered destructive devices.

23. According to the CHS, Schneider has a desktop and/or laptop and a computer tablet located in his room. Due to Schneider's active use of the internet to access Facebook, I submit that it is reasonable to believe that Schneider uses computers, telephones, and/or computer tablets to communicate with others about his activities in assembling destructive devices. It is also reasonable to believe that Schneider uses these same devices for online purchasing of items used in the assembling of destructive devices and looking up instructions on how to assemble said devices.

24. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

25. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

26. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

27. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

28. Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as

links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

29. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

30. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

31. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

32. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

33. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

34. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

35. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

36. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

37. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

38. In addition to the applications described above, Facebook also provides its users with access to thousands of

other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

39. Some Facebook pages are affiliated with groups of users, rather than one individual user. Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter. Facebook can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group. Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

40. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

41. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

42. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

43. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates

to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

44. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

45. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

46. This application seeks a warrant to search all responsive records and information under the control of Facebook, a provider subject to the jurisdiction of this court, regardless of where Facebook has chosen to store such information. The government intends to require the disclosure pursuant to the requested warrant of the contents of wire or electronic communications and any records or other information pertaining to the customers or subscribers if such communication, record, or other information is within Facebook's possession, custody, or control, regardless of whether such communication, record, or other information is stored, held, or maintained outside the United States. [2]

## REQUEST FOR NON-DISCLOSURE

47. Pursuant to 18 U.S.C. §§ 2703(b)(1)(A) and 2705(b), your Affiant requests the Court order Provider not to notify any other person of the existence of this warrant for the period of one year. This request is made because notification of the existence of the warrant will result in flight from prosecution and/or destruction of or tampering with evidence.

48. Because the investigation is ongoing, I would further request the Court to order Provider to continue to maintain the account further detailed in Attachment A, in an open and active status.

## CONCLUSION

49. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

50. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

51. Based on the aforementioned factual information, I respectfully submit that there is probable cause to

---

[2] It is possible that Facebook stores some portion of the information sought outside of the United States. In Microsoft Corp. v. United States, 2016 WL 3770056 (2nd Cir. 2016), the Second Circuit held that the government cannot enforce a warrant under the Stored Communications Act to require a provider to disclose records in its custody and control that are stored outside the United States. As the Second Circuit decision is not binding on this court, I respectfully request that this warrant apply to all responsive information—including data stored outside the United States—pertaining to the identified account that is in the possession, custody, or control of Facebook. The government also seeks the disclosure of the physical location or locations where the information is stored.

believe that evidence, fruits, and instrumentalities of 18 U.S.C. § 842(a)(1) (Manufacturing or dealing in explosive material without a license) and 26 U.S.C. §§ 5841, 5861(d), and 5871 (Possessing Unregistered Firearms) may be located within the Facebook account described in Attachment A.

52. I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the items listed in Attachment B.

*s/ Scott Dahlstrom*_____
Scott Dahlstrom, Special Agent
FBI

SUBSCRIBED and SWORN before me this __24th__ day of October 2019.

_____
UNITED STATES MAGISTRATE JUDGE

Application for search warrant was reviewed and is submitted by Julia Martinez, Assistant United States Attorney.

8